HEXTER TITLE AND ABSTRACT CO., INC., V. GRIEVANCE COMMITTEE, FIFTH CONGRESSIONAL DISTRICT, STATE BAR OF TEXAS ET AL.

No. 8207. Decided May 3, 1944.
(179 S. W., 2d Series, 946.)

*Touchstone, Wright, Gormley & Touchstone* and *Allen Wight,* all of Dallas, for petitioner.

Plaintiffs have no justiciable interest in the matter complained of, and in the absence of statutory authority in them an injunction will not lie at their instance to prevent public

wrongs. Woods v. Kiersky, 14 S. W. (2d) 825; Crowder v. Graham, 201 S. W. 1053; Mingus v. Wadley, 115 Texas 551, 285 S. W. 1084; Ex parte Hughes, 133 Texas 505, 129 S. W. (2d) 270.

*R. Guy Carter, Wm. P. Goar, C. K. Bullard* and *C. C. Renfro*, all of Dallas, for respondents.

It is the right of a duly licensed lawyer to maintain an injunction to prevent the unauthorized practice of law. Sharp-Boylston Co. v. Haldane, 182 Geo. 833, 187 S. E. 68; Depew v. Wichita Retail Credit Ass'n., 141 Kan. 481, 42 Pac. (2d) 214.

MR. CHIEF JUSTICE ALEXANDER delivered the opinion of the Court.

The Grievance Committee of the State Bar of Texas for the Fifth Congressional District brought this suit against Hexter Title and Abstract Company, Inc., to enjoin said defendant from doing certain acts which were alleged to be the practice of law in violation of the statutes of this State. The trial court granted part, but not all, of the relief prayed for by plaintiff. Upon appeal the Court of Civil Appeals reversed the judgment of the trial court in part, and granted the full relief prayed for by plaintiff. 175 S. W. (2d) 108. Hexter Title and Abstract Company, Inc., applied for and obtained a writ or error to this Court.

The Bar Association of Dallas was at one time a party plaintiff in the suit, but the trial court sustained a plea in abatement as to said plaintiff, and that part of the judgment of the trial court was affirmed by the Court of Civil Appeals. The Bar Association of Dallas has not attempted to prosecute any further appeal from the judgment in that respect, and hence we need not consider whether said Association had the right to maintain the suit.

Before considering the specific points raised by the appeal it would be well to review the statutes heretofore enacted by the Legislature of this State for the purpose of regulating the practice of law and the purposes sought to be accomplished thereby. In 1933 the Legislature enacted Penal Code Article 430a (Vernon's Anno. P. C.; Acts 1933, p. 835), which carefully defined what constituted the practice of law and designated who were prohibited from so practicing. In 1939 the Legislature went one step further and enacted the State Bar Act (Vernon's

Anno. Civ. Stat. Art. 320a-1; Act 1939, 46th Leg., p. 64), which had for its purpose the further regulation of the practice of law. That Act created the organization known as the State Bar, composed of the registered licensed attorneys of the State, and constituted it an administrative agency of the judicial department. The same Act empowered the Supreme Court, with the approval of a majority of the registered licensed lawyers, to prescribe rules and regulations "for discipling, suspending, and disbarring attorneys at law; for the conduct of the State Bar; and prescribing a code of ethics goverening the professional conduct of attorneys at law." The Act prohibited those not members of the State Bar from practicing law, and empowered the agency there created to carry out the purposes of the Act. The primary purpose of the Legislature in the enactment of the above legislation was to protect the public by eliminating from the law profession those morally unfit to enjoy the privileges and those lacking in proper training and other qualifications necessary to perform the services required of an attorney. The practice of law is a matter of vital interest to the public. The lawyer is primarily engaged in the protection and preservation of the liberties and property rights of the people and the administration of justice among them, which is one of the primary purposes of good government. As society has become more compact the law has necessarily become more complex, requiring increased skill in its application. The Legislature in recognition of this fact has from time to time increased the prelegal and legal attainments required for admission to the Bar. These safeguards have been deemed necessary by the Legislature to protect the public against the loss of their liberty and property rights through ill advice from incompetent practitioners. It is readily apparent that it would serve no useful purpose to require high standards of efficiency for members of the legal profession if those who have not attained these standards of efficiency are to be permitted to practice the arts of the profession. Also, the relation between attorney and client is a most intimate one, involving the highest degree of confidence and trust, and in which, as a consequence, there is almost unlimited opportunity for fraud on the part of the attorney. It is apparent, therefore, that those who are to be entrusted with the opportunities of such a position should be possessed of a high degree of integrity. In recognition of this the Legislature has set up machinery for the establishement of canons of ethics for the profession, and the disbarment of those guilty of fraudulent or dishonorable practice or malpractice. Again, it would be useless to establish high standards of morality for members of the profession if those who are not members, and therefore

not bound by such canons, could practice the arts of the profession. The State has a vital interest in the regulation of the practice of law for the benefit and protection of the people as a whole, and the legislation above referred to was adopted in furtherance of a wholesome public policy.

The first contention here presented is that the Grievance Committee of the State Bar had no authority to maintain the suit to enjoin the defendant from practicing law.

■ It is a very well established rule in this State that a plaintiff cannot maintain a suit to enjoin the violation of a criminal law unless such violation results in damage to such plaintiff or otherwise affects him in a manner peculiar to him, and not common to the public in general. Woods v. Kiersky (Com. App.), 14 S. W. (2d) 825, 828. We believe, however, that the plaintiff in this case has an interest in the subject matter of the suit that is peculiar to it, and not common to the public in general.

■ The State Bar Act (Art. 320a-1, Vernon's Anno. Civ. Stats.; Acts 1939, 46th Legis., p. 64) reads in part as follows:

"Section 2. *There is hereby created the State Bar, which is hereby constituted an administrative agency of the Judicial Department of the State,* with power to contract with relation to its own affairs *and which may sue* and be sued *and have such other powers as are reasonably necessary to carry out the purposes of this Act.*

"Section 3. All persons who are now or who shall hereafter be licensed to practice law in this State shall constitute and be members of the State Bar, and shall be subject to the provisions hereof and the rules adopted by the Supreme Court of Texas; *and all persons not members of the State Bar are hereby prohibited from practicing law in this State. * * *"* (Italics ours.)

It will be noted that one of the purposes of the above Act was to subject all members of the Bar to the provisions of the Act, and another purpose was to *prohibit those not members of the State Bar from practicing law.* The State Bar Act was created as an administrative agency of the judicial department to carry out these purposes, and was given the right to sue and "such other powers as are reasonably necessary to carry out the purposes of this Act." In other words, the State Bar prohibited persons not members of the State Bar from practicing law, and conferred upon the State Bar all the powers reasonably neces-

sary to effectuate that purpose. The Act at least impliedly made it the duty of the State Bar to enforce the provisions thereof which prohibited non-members from practicing law. It therefore had an interest in the subject of the suit peculiar to itself, such as would authorize it to maintain a suit for the enforcement of the provisions of the Act.

The Act clearly conferred upon the State Bar all powers reasonably necessary to prohibit those not members of the State Bar from practicing law. This would imply the power to sue out an injunction where such was reasonably necessary to accomplish this purpose. The Legislature had theretofore recognized injunctive relief as a proper means to prohibit the unlawful practice of law. It had authorized county and district attorneys to sue out injunctions for that purpose. Penal Code Art. 430a (Vernon's Anno. P. C.; Acts 1933, 43rd Leg., p. 835, ch. 238). Having there recognized injunction as a proper remedy for such violations, and having subsequently, in the State Bar Act, conferred upon the State Bar all powers reasonably necessary to prohibit those not members of the State Bar from practicing law, it follows as a necessary implication that the State Bar could employ the lawful remedy of injunction to prevent such violations.

A very similar question was before the Supreme Court of Oklahoma in the case of State Bar of Oklahoma v. Retail Credit Association, 170 Okla. 246, 37 Pac. (2d) 954. The State Bar Act of that State created the State Bar, prohibited those not members thereof from practicing law, and conferred upon the State Bar all the powers and duties of the Act; and, in substance, charged it with the duty of enforcing the provisions thereof. It was there held that the State Bar was a proper party to maintain a suit to prevent violation of the Act, and that injunction was a proper remedy for such violations. In the case of Kentucky State Board of Dental Examiners v. Payne, 213 Ky. 382, 281 S. W. 188, the court had under consideration an Act which created the State Board of Denal Examiners, prohibited those not licensed from practicing denistry, and empowered the Board to carry out the provisions of the Act. It was there held that the Board had authority to enforce the provisions of the Act by whatever lawful means it might employ for that purpose, and that injunction could be resorted to for the purpose of preventing one from practicing the profession of denistry who had not previously procured a license and otherwise complied with the provisions of the Act.

We hold that the broad provisions of the Act here under

consideration were sufficient to confer upon the State Bar the authority to sue out an injunction to prevent one who was not a member thereof from practicing law.

■ It is true this suit was not brought in the name of the State Bar. It was brought in the name of a Grievance Committee of the State Bar, but in this there was no error. Section 4 of the State Bar Act authorized the Supreme Court to prepare and propose rules for the conduct of the State Bar, and further provided that when the rules were approved by a vote of the registered lawyers of the State, they should be adopted and promulgated by the Court and become effective for that purpose. In compliance with the provisions of the Act the Supreme Court did adopt and promulgate rules for the conduct of the State Bar. Section 16 of these rules provides for the creation of Grievance Committees. Section 18 authorizes such committees to receive and hear complaints of professional misconduct alleged to have been committed by members of the Bar. Section 35 authorizes such committees to maintain suits to prohibit the unlawful practice of law. Said Section 35 reads in part as follows:

"Each Grievance Committee may institute and prosecute appropriate suits or proceedings, in the name of the committee, or any member thereof, or any party complaining, as may be advisable in the opinion of the majority of the committee, to suppress, prohibit, or prevent such unauthorized practice of the law, or may take such other action as it deems advisable under the circumstances, such as the filing of criminal charges or complaints. Such suits, proceedings, complaints, or criminal charges shall be prosecuted by a member or members of the committee, or by members of the Bar, as may be determined by the committee."

It will be seen that the Act conferred upon the Supreme Court the authority to prescribe rules for the conduct of the State Bar, and the Court in compliance therewith adopted a rule which authorized the State Bar to maintain suits to prohibit the unlawful practice of law in the name of the Grievance Committee. It was not a matter of substantive law, but purely one of procedure, as to who should be permitted to maintain such a suit. The Act was broad enough to authorize the Supreme Court to prescribe the procedure to be followed in such matters. Undoubtedly the Supreme Court could prescribe through whom and in what name the State Bar should sue. Consequently the Grievance Committee had the authority to maintain the suit.

The second question is, was the defendant practicing law within the meaning of the Statutes of this State? The case was presented on an agreed statement of facts, from which we copy the following pertinent provisions:

"1. * * Defendant Hexter Title & Abstract Co., Inc., is a corporation organized and existing under and by virtue of the laws of the State of Texas 'to make, compile and own abstracts of title to land and liens of any character on any property or any other abstracts of record in this State or county thereof required by law' * * *.

"2. Defendant has heretofore furnished opinions as to conditions of title to real estate but has discontinued such practice more than three months prior to the filing of this cause and does not intend or purpose to engage in such course of conduct.

"3. Defendant's officers, agents and employees, with its approval and authority, have heretofore prepared, are now preparing and, unless restrained, will in the future prepare for execution by persons not employed in its business (a) deeds conveying land in which it owns no interest and does not acquire an interest by such deeds, (b) notes, mortgages, and deeds of trust in which it has no interest as borrower or lender, and (c) mechanic's and materialmen's lien contracts to which it is not a party, (d) releases, transfers, subordination agreements and other instruments affecting the title to real estate and liens thereon in which it does not own and is not acquiring an interest therein, and (e) such additional instruments as may be necessary in connection with perfecting the titles upon which it is issuing or plans to issue title policies. Most of such instruments have been and hereafter will be prepared in connection with transactions in the course of which defendant issues or obligates itself to issue policies of title insurance. The defendant has occasionally in the past and will occasionally in the future prepare some or all of the foregoing instruments for execution by persons not employed in its business in connection with transactions in which it does not issue or is not obligated to issue policies of title insurance but has prepared an abstract of title.

"4. No separate charge is made by defendant for such service set forth in paragraph 3 but defendant is obligated to and does charge premium rates for title insurance policies as fixed by the Insurance Commissioners of Texas. Such regulations prescribing the schedule of fees for title insurance include a provision that such charges include 'the fee for insurance, title examination and closing of deal, no other services,' and that

'fees for all other services such as conveyancing, escrow and inspection shall be the customary fee for such services in the particular county in which the service is being rendered.'

"5. Defendant has in its employ four licensed attorneys who supervise the preparation and execution of the instruments listed in paragraph 3 hereof and advise the interested parties the purpose and effect thereof but who do not perform any other legal services on behalf of defendant for patrons and customers of defendant.

"6. Defendant does not advise persons, firms and corporations as to their legal rights except as to the purpose and effect of the instruments drawn as set out in paragraph 3 and in the manner set out in paragraph 5.

"7. Defendant holds itself out to perform such services for its customers and as possessing authority to render services for them, as set forth in paragraph 3 hereof, which services defendant does not agree constitute 'legal services,' but other than such services, defendant does not hold itself out to perform legal services for its customers and as possessing authority to render legal services for them which require the use of legal knowledge or skill.

"8. Defendant openly solicits employment verbally and by advertisement, for the preparation of abstracts and the issuance of title policies and in connection with the issuance of title policies, represents that it will prepare, in connection therewith, instruments set forth in paragraph 3, but does not otherwise solicit legal employment nor does it induce its customers and the public to place themselves at the mercy of the defendant and its employed legal staff."

"11. The business of the defendant unless and unto the extent only that the foregoing shows, has been conducted in accordance with the rules and regulations of the State Board of Insurance Commissioners.

"12. Defendant does not direct or attempt to control the employment of counsel in any litigation necessary to perfect title to real estate for the purpose of procuring the issuance of title policies by the company.

"13. Defendant, by contractual arrangement, is engaged in writing policies of title insurance issued by a corporation authorized by charter to issue title insurance policies and defendant is the agent for said issuing company as empowered by the title insurance act."

It was further agreed that the attorneys at law mentioned in paragraph 5 of the above stipulation were employed by the corporation on regular salaries, and the work which they did in the preparation of the conveyances referred to was suggested by the executive officers of the company and was performed under the direction and control of such executive officers, and not under the direction and control of persons for whom the work was done, and in most instances they never saw the person for whom the work was done. The executive officers of the company told the attorneys what kind of instruments to draw and what to put in them. All contracts by the customers were with some executive officer of the company, and not the attorney. In most instances the attorney did not see the customer and was not requested nor instructed by the customer as to what he should put in the instruments.

The plaintiff alleged that the defendant furnished opinions as to condition of title to real estate, and otherwise advised persons as to their legal rights; that it prepared the documents and did the other things set out in paragraph 3 of the agreed statement of facts; that it held itself out to perform legal services to its customers and represented that it possessed authority to render legal services for them, and openly solicited legal employment verbally and by advertisement. The trial court enjoined the defendant from preparing for other parties conveyances or other instruments of writing affecting the title to land "except in connection with transactions in which it issues, or is requested or expected to issue, policies of title insurance." The petition for injunction in all other respects was denied. The Court of Civil Appeals enjoined the defendants from engaging in the matters and things complained of by plaintiff and more especially those things enumerated in stipulation 3 of the agreed facts in this case.

Article 430a, Vernon's Anno. P. C. (Acts 1933, p. 238) reads in part as follows:

"Sec. 1. It shall be unlawful for any corporation or any person, firm, or association of persons, except natural persons who are members of the bar regularly admitted and licensed, to practice law.

"Sec. 2. For the purpose of this Act, the practice of law is defined as follows: Whoever * * * (b) For a consideration, reward or pecuniary benefit, present or anticipated, direct, or indirect, advises or counsels another as to secular law, or draws a paper, document or instrument affecting or relating to secular

rights; * * * or (d) For a consideration, direct or indirect, gives an opinion as to the validity of the title to real or personal property, * * * is practicing law. Nothing in this section shall be construed to prohibit any person, firm, association or corporation, out of court, from attending to and caring for his or its own business, * * * nor from preparing abstracts of title, certifying, guaranteeing or insuring titles to property, real or personal, or an interest therein, or a lien or encumbrance thereon, * * * .

"Sec. 3. It shall be unlawful for any corporation to practice law as defined by this Act or to appear as an attorney for any person other than itself in any court in this State, or before any judicial body or any board or commission of the State of Texas; or hold itself out to the public or advertise as being entitled to practice law; and no corporation shall prepare corporate charters or amendments thereto, or other legal documents not relating to its authorized business, or draw wills; or hold itself out in any manner directly or indirectly as being entitled to do any of the foregoing acts; * * * ."

The defendant in this case is a corporation, and by the express provisions of Section 1 of the above Act is prohibited from practicing law.

■ According to the facts set out in the agreed statement, and particularly paragraph 3 thereof, the defendant draws deeds, notes, mortgages, and releases relating to the property rights of others. According to paragraph 2 of the stipulation it has been furnishing opinions as to the condition of the title to real estate, and according to paragraphs 7 and 8 it holds itself out as possessing authority to render such services, and advises interested parties as to the purpose and legal effect of the instruments drawn by it. It therefore advises others as to the secular law, and draws deeds and other papers relating to secular rights within the inhibition of the above statute. These acts, when performed for a consideration, constitute the practice of law, both within the terms of the statute above referred to and the decisions of the courts on the subject. People v. People's Stock Yards State Bank, 344 Ill. 462, 176 N. E. 901; Paul v. Stanley, 168 Wash. 371, 12 Pac. 2d 401; People v. Alfani, 227 N. Y. 334, 125 N. E. 671; Land Title Abstract & Trust Co. v. Dworken, 129 Ohio St. 23, 193 N. E. 650.

■ No separate charge is made for the services above referred to. The defendant apparently advertises and holds itself out as furnishing this legal service without charge. However, it

is not true in fact that such services are furnished free of cost to the customer. This legal service is advertised as a leader to induce prospective customers to come in and transact other business in which there is greater profit. It is offered as an inducement to contract for an abstract of title, for which a direct charge is made, or to allow the defendant's principal to insure the title to the property involved, for which the defendant receives a commission. The furnishing of such legal services constitutes a part of the cost of obtaining the business transacted by the defendant. Evidently it pays, or the practice would be discontinued. It constitutes a part of the total service for which the customers pay. There is therefore "a .consideration, reward, or pecuniary benefit" flowing to the defendant for the legal services so rendered. See McDonald v. Leonard Bros. (Civ. App.) 134 S. W. 2d 460; Dallas Hotel Co. v. Richardson, (Civ. App.) 276 S. W. 765; State ex inf. Miller, Circuit Atty., v. St. Louis Union Trust Co., 335 Mo. 845, 74 S. W. (2d) 348, 356; Herbert v. Shanley, 242 U. S. 591, 37 S. Ct. 232, 61 L. Ed. 511; 5 Tex. Jur., p. 1015, sec. 5; 19 C. J. S. 407, note 17.

■ Defendant's counsel recognizes that if these transactions were in nowise related to the defendant's business, the defendant would be practicing law within the inhibition of the statute, but he contends that the transactions relate to the business of the defendant, and therefore they come within the provisions of the statute which permit a corporation to attend to "its own business." He asserts in his brief that the only question involved is "whether or not the legal document whose preparation is enjoined *relates* to the authorized business of the defendant."

The defendant is incorporated for the purpose of making abstracts of title to land and liens thereon. The preparation of the conveyances and other instruments covered by the injunction in nowise relates to this business. As we understand this record, defendant is not incorporated to write title insurance. However, the defendant acts as agent for a title insurance company, and as such makes contracts for its principal to insure the title to land and liens thereon. It is contended that the preparation of the instruments referred to relates to the business of its principal of insuring titles. Its contention is that it has the right to prepare all papers necessary to place a good title in the applicant, or prospective applicant, in order that it may then safely insure the title to such property, and that in doing so it is only transacting the business of the title insurance company. We are of the opinion, however, that the prep-

aration of such papers is not the business of the insurance company. In this connection, it should be noted that this suit does not involve the right of the corporation to prepare the contract of insurance to which the insurance company would be a party, nor does it relate to documents prepared to cover the release or discharge of the company from obligations previously incurred by it. These transactions involve conveyances, releases, and mortgages from grantors to grantees, and to which the insurance company is not a party. They are executed for the purpose of placing good title in the grantee, so that the insurance company may thereafter insure the title if it chooses. Such papers relate to the rights of third parties in which the corporation has no present interest, but only a prospective one. They affect the rights of individuals apart from their interest in the title insurance policy. The work of preparing these papers is distinct from the searching and insuring of the title—the legitimate business for which the corporation is incorporated. It is not the business of the title insurance company to create a good title in an applicant for insurance by preparing the necessary conveyances, nor to cure defects in an existing title by securing releases or prosecuting suits to remove clouds from title, merely for the purpose of putting the title in condition to be insured. The title insurance company must accept the title and insure it as it is, or reject it. It may examine the title, point out the defects, and specify the requirements necessary to meet its demands, but it is the business of the applicant for the insurance to cure the defects.

The defendant relies upon the decisions of the New York court in the cases of People v. Title Guarantee & Trust Co., 227 N. Y. 366, 125 N. E. 666, and People v. Title Guarantee & Trust Co., 191 App. Div. 165, 181 N. Y. S. 52, affirmed 230 N. Y. 578, 130 N. E. 901. The decisions in the above cases were not followed in the later case of People v. Lawyers Title Corporation, 282 N. Y. 513, 27 N. E. (2d) 30. In this last case the New York Court of Appeals held that a title insurance company, even though it had the right to transact its own business, was without authority to prepare conveyances and other title papers merely for the purpose of creating a good title in an applicant for insurance in order that it might thereafter insure the title. It held that the preparation of such title papers was not a necessary incident of the business of insuring titles.

If the defendant's contention that it has the right to prepare all legal documents necessary to create a good title in the applicant so that it may thereafter make a valid and safe

contract to insure the title be sound, then a contractor, wholly unlearned in the law, could with equal propriety advertise that if a prospective purchaser of real property would give him a contract to construct a building thereon, he would examine the abstract of title to the land for the prospective purchaser and draw all papers necessary to put good title in such purchaser. The contractor could argue that in doing so he was only transacting his own business, because it was necessary for the purchaser to have good title to the property in order to enable the contractor to take a valid lien thereon to secure his cost. A fire insurance agent could advertise that if a prospective purchaser of real property would agree to insure the buildings on the premises through his agency he would examine the title and prepare all papers necessary to make the purchaser the owner thereof. Loan companies and banks could make similar propositions on condition that they be permitted to place a loan on the property. Corporations engaged in buying municipal bonds could propose to prepare the bond record and supervise the election for the issuance of the bonds and perform all other necessary legal services, if the municipality would promise to sell the bonds to such corporations. These examples could be multiplied indefinitely. Ultimately most legal work, other than the trial of cases in the courthouse, would be performed by corporations and others not licensed to practice law. The law practice would be hawked about as a leader or premium to be given as an inducement for business transactions.

In amici curiae briefs filed by other title insurance companies it is contended that title insurance companies must be allowed to prepare such papers because they cannot safely depend on outsiders to draw them. This apparently recognizes that such papers must be drawn with great care. The very fact that it is difficult to draw the papers correctly so as to meet the demands of the insurance companies furnishes but another reason why they should be drawn by a licensed lawyer, and not by a layman or a corporation. However, we do not wish to be understood as holding that a layman could engage in the practice of law, even though it involves only the preparation of simple instruments, for, as said by Judge Pound in People v. Title Guarantee & Trust Co., 227 N. Y. 366, 125 N. E. 666, 670, "I am unable to rest any satisfactory test on the distinction between simple and complex instruments. The most complex are simple to the skilled, and the simplest often trouble the inexperienced." It is further contended that such insurance companies should be allowed to prepare such papers as a matter of expediency, because much time could be saved

if all the papers were drawn in the same office. A matter of expediency would not justify this Court in ignoring the plain terms of the statute nor the public policy in this State, which has been established for the protection of the fundamental rights of its citizens.

This is not a case of an isolated transaction in which a legal document had been prepared as a pure gratuity. Here the corporation holds itself out as being qualified to perform these legal services, and it has done so with continuity for the purpose of increasing the legitimate business of its principal.

■ The fact that the corporation has several licensed lawyers in its employment to prepare the instruments in question does not alter the case. According to the agreed statement of facts the executive officers of the corporation direct the kind of instruments to be drawn and what should be put in them. But even in the absence of such direction by the executives the result would be the same. The attorney in preparing such papers does so as the agent of the corporation by whom he is employed. His first obligation of loyalty is to the corporation. His acts are the acts of the corporation, and even though the corporation acts through an attorney, it is nevertheless practicing law. In re Co-operative Law Co., 198 N. Y. 479, 32 L. R. A. (N. S.) 55, 139 Am. St. Rep. 839, 92 N. E. 15, 19 Ann. Cas. 879; In re Otterness, 181 Minn. 254, 232 N. W. 318, 73 A. L. R. 1319; People v. People's Stock Yards State Bank, 344 Ill. 462, 176 N. E. 901; Land Title Abstract & Trust Co. v. Dworken, 129 Ohio St. 23, 193 N. E. 650; 5 Am. Jur. 276, sec. 25; 19 C. J. S. 404.

■ Most assuredly the insurance company may examine for its own benefit the abstract of title to property which it proposes to insure, to determine whether or not it will insure the title, and it may specify the corrections necessary to meet its demands. But it may not furnish a title opinion to a prospective purchaser to be used by him in determining whether or not he will buy the property, neither may it hold itself out as being authorized to do so.

We are of the opinion that the judgment of the Court of Civil Appeals was correct.

We have placed our decision in this matter largely upon the statutes of this State. We have not found it necessary to determine whether or not this Court would have the implied authority to determine what would constitute the practice of

law, independent of the ·statute, nor whether or not in the absence of statutory authority the trial court would be authorized to enjoin one from engaging in the unlawful practice of law.

As previously stated, the defendant is incorporated for the purpose of making abstracts of title. It is not incorporated for the purpose of insuring titles, nor to act as agent for title insurance companies. No one has raised the question of the right of a corporation, incorporated for the purpose of making abstracts of title, to act as agent for a title insurance company. We do not wish to be understood as impliedly recognizing such right. We have not found it necessary to pass on that question in order to properly dispose of this case.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered May 3, 1944.