AZZARELLO, PLAINTIFF-APPELLANT, *v.* LEGAL AID SOCIETY OF CLEVELAND, DEFENDANT-APPELLEE.
BENJAMIN, PLAINTIFF-APPELLANT, *v.* LEGAL AID SOCIETY OF CLEVELAND, DEFENDANT-APPELLEE.

Ohio Appeals, Eighth District, Cuyahoga County.

Nos. 25905, 25940. Decided October 25, 1962.

*Mr. J. Frank Azzarello* and *Mr. Charles Goldman,* for plaintiff-appellant, J. Frank Azzarello.

*Mr. Elmer I. Schwartz,* for plaintiff-appellant, Ronald Mann Benjamin.

*Messrs. Burke, Haber & Berick, Mr. Morris Berick,* of counsel, for defendant-appellee.

The American Bar Association, by its Standing Committee on Legal Aid Work, *Mr. John W. Cummiskey,* of counsel, and The Cleveland Bar Association, by its Legal Aid Committee, *Mr. Louis Paisley,* of counsel, for Amicus Curiae.

SKEEL, J. These appeals come to this court on questions of law from judgments entered for the defendant in each case after trial in the Court of Common Pleas of Cuyahoga County. The *Benjamin case* (25940) was presented to the court on stipulations of fact. In that case, while the ultimate question to be determined is identical with that of the *Azzarello case,* the facts stipulated deal with a new phase of the work of the Legal Aid Society in developing a department of "Legal Aid Defender." In this new development of the Society, a plan was adopted to support the office of a "Legal Aid Defender" through which a lawyer of such department could be called upon to represent

(as provided by law) an indigent person in a criminal prosecution. By contract between the Society and the "Legal Aid Defender" certain monies contributed as a charitable gift have been made available to the "Defender" to maintain an office, under which contract he is empowered to employ necessary assistants and office help. The "Defender," under the terms of the contract, will, when called upon to do so by lawful authority, or by an indigent defendant, defend such person accused of crime in the courts of Cuyahoga County. The "Defender," under the contract, is to confine his practice to representing indigents in need of legal services in defense of criminal charges filed against them in Federal, Common Pleas, or Municipal Courts in Cuyahoga County. Such "Defender" cannot accept fees or compensation for or on behalf of the persons thus requiring his services on the grounds of indigency except the statutory fee payable to assigned counsel in the Court of Common Pleas under the provisions of Sections 2941.50 and 2941.51, Revised Code. The contract provides that fees paid under said sections to the "Defender" or lawyers in his employ resulting from being assigned to the defense of an indigent defendant by a judge of the Court of Common Pleas shall be endorsed and delivered to the Society and by it deposited in a trust fund kept by the Cleveland Welfare Federation for the benefit of the "Defender," and from which trust fund disbursements can be made only upon the order of the "Defender" in the maintenance of his office. Before creating the office of "Legal Aid Defender" as a part of the work of the Legal Aid Society, a study of the problem of the defense of indigent defendants in criminal cases was made. The report was submitted to the Cleveland and Cuyahoga Bar Associations, and after making the changes they suggested, the plan thus adopted was put into effect in March of 1960. The Cleveland Foundation allocated One Hundred Thousand Dollars to the Society to defray the cost of establishing the Legal Aid Defender's Office over a period of four years.

The only part of the *Benjamin case* which differs or goes beyond that of the *Azzarello case* is that part which deals with the use of money for the maintenance of the Society's "Defender Plan" in criminal cases deposited in the "Defender's"

trust fund coming from fees earned and paid out of the county treasury to the "Defender" or one of his lawyer assistants after completing an assignment to defend an indigent defendant in a criminal case.

The contract between the "Defender" and the Society, after providing the manner of the financial support of the "Defender," including the deposit to the trust account, funds received by its salaried lawyers from the county upon concluding an assignment as provided by law, provides that in the event of the termination of such contract, then the funds in the trust account shall be used to liquidate the obligations of the "Defender" and that sums remaining in the trust fund shall be refunded to the governmental agencies from which they had been derived on the basis of their respective contributions to such trust fund. The contract further provides:

"Under no circumstances shall said sums or any part thereof be returned to or paid over to the Society or paid to, or inure to the benefit of any member, trustee or officer of the Society."

That the Court of Common Pleas may legally assign the "Defender" or any of his salaried lawyer assistants to defend a defendant charged with a felony where the court has found such defendant to be indigent and entitled to the service of a lawyer at the expense of the state, and that when the "Defender" renders the services and receives an order from the court for his fees, it becomes the duty of the auditor to issue his voucher therefor, has been clearly decided by the Supreme Court.

In the case of *State, ex rel. McCurdy* v. *Carney, Auditor*, 172 Ohio St., 175, 174 N. E. (2d), 253, an action in mandamus was filed seeking an order to compel the County Auditor to issue a warrant to the relator (The Legal Aid Defender) in payment for attorney fees (in the sum of $200.00) ordered by the Court of Common Pleas to be paid to the relator, an attorney at law, he having upon assignment by the court conducted the defense of an indigent defendant. On these facts, the court held that the assigned "Defender" was entitled to the warrant. The court said that the claim that the writ should be denied because the relator had made an agreement with a cor-

poration not for profit under the terms of which he was to receive an annual salary and expenses for representing indigent persons and the fact that such defender had agreed to transfer the fee received from the state when paid under Section 2941.50, Revised Code, by depositing it in the trust fund held for the "Defender" by the Welfare Federation of Cleveland, was without legal foundation. The court said on page 177 of the opinion:

"Apparently, respondent contends that, by reason of this agreement, (1) the Legal Aid Society is engaged in the unlawful practice of the law, (2) either that society or the Welfare Federation of Cleveland or both are doing things prohibited or unauthorized by law, and (3) relator is doing what he as an attorney should not do or agree to do. These are all contentions which could be considered in proper proceedings either against the society or against the federation or against the relator. However, we fail to see how the validity of any such collateral contentions could affect the rights of relator under the admitted facts of the instant case."

There is no doubt but that the money, when received by the "Defender," became his property. The Supreme Court held it was within his legal rights to receive it and the disposition he makes of the money after its receipt from the state is his concern. Certainly the payment of such money by him into a trust fund from which his salary and the expense of his office are defrayed is a lawful transaction and such facts standing alone could in no way be interpreted to mean that the Legal Aid Society was engaging in the unlawful practice of law. This claim in the *Benjamin case* is, therefore, overruled.

An examination of the evidence presented by the bill of exceptions in the *Azzarello case* indicates that the Legal Aid Society was organized in 1905 by forming a corporation not for profit to carry out the purposes of the Society. Its purpose was stated to be "to render legal assistance gratuitously or for a moderate charge to deserving persons not otherwise able to obtain the services of competent attorneys." The Legal Aid Society has since been maintained by charitable contributions. The history of the Society shows that grants of assistance are extended to persons on the basis of poverty of the one in need of the services of a lawyer, the service being pro-

vided gratuitously, or for a very moderate charge if the person seeking help can afford it, made to the lawyer who accepts such person as a client under his agreement for compensation with the Legal Aid Society. The Society's relationship with the lawyer who renders the service is either on a retainer or salary basis. The Legal Aid Society derives no benefit from its activities in making possible needed legal assistance to indigent persons. Such small amount as the indigent can afford to contribute toward the fee of the lawyer (when considered in the aggregate amounts to only a few cents per case) and when received, reduces in the amount required to sustain the financial burden assumed by the Society in making legal services available to indigents. It is also shown by credible evidence that the only authority ever exercised by the Society over the lawyer extending his services to one claiming indigency is to determine whether the person seeking help is, in fact, indigent, the lawyer to whom the request for service is made being in doubt on that question.

The plaintiff in the *Azzarello case*, after examining the Cuyahoga County Common Pleas indexes and some of the records of the lawyers on retainer of the Society of cases handled by him established that certain fees were paid to him by order of the court as a result of carrying on the litigation. Most of the cases were actions in divorce and the fees involved were ordered by the court as a part of the decree in divorce or on motion for expenses pendente lite, the order to pay fees being made against the party not represented by the lawyer furnished by the Society. The justice of permitting such procedure and the collection of the fees ordered by the court must be apparent. A person in need of the services of a lawyer under circumstances coming within the purpose clause of the Society should be entitled to the same rights for the payment of fees and expenses against the adverse party as those able to hire the services of a lawyer. The fees thus ordered paid are paid by the adverse party. Such fees unquestionably lighten the burden that the Society must assume under the provisions of its Charter. The question of the point where, to carry out the purposes of the Society, aid will be given or refused in a particular case, is one of difficult determination. Certainly the purposes of the

Society could not be fulfilled if all relief were denied except as to persons completely destitute. The true value of the services of a lawyer vary with the circumstances of the case or problem involved. If a client in order to meet reasonable demands in a particular case is required or compelled to surrender all of his property before he is entitled to assistance in securing the services of a lawyer, the purposes of the Society would not be met. We find no credible evidence that would require the trial court to find that legal help was extended where it should not have been given.

It is evident from the above detail of the two cases that the only legal question presented is whether or not the Legal Aid Society, in making available the service of a "Defender" for an indigent defendant facing a criminal prosecution and in making like services available to indigents in civil matters, is, in fact, engaging in the unlawful practice of law.

The need for the services of a lawyer is one of the realities of life in a democratic state. Ours is a government of law. The rights of all are thus defined and to maintain and protect such rights, recourse to the courts and those licensed to practice law is a frequent and necessary occurrence. That this should be so is clearly demonstrated by the historic development of liberty under law. Wigmore, in his work "Panorama of the World's Legal Systems," in the chapter dealing with the development of rule by law at about the time of the beginning of the Christian era and the part of such development contributed by the Legal Profession, said, at page 396:

"5. This advanced stage of law and practice had, of course, been developed by a legal profession."

Also, on page 1077, of the same work, after laying the foundation for the development of the common law of England as a world legal system as being exclusively the work of the legal scholars and philosophers, beginning with William I and his forceful successors, Henry II and Edward I, it is stated:

"And so what with William and his successors, and Domesday Book and Westminster Hall, and Bracton, and the Inns of Court, and the Year-Books, the close of the 1400's finds England with a single unified common law of its own, a distinctive one, not merely a branch of the crude Germanic system."

It has since followed that progress in maintaining liberty under law has depended upon the professional class in the law. It has been the province of the lawyers to develop the rules and procedure for maintaining the rights of people. Members of the professional class in the law can attain the right to practice as advocates and counselors at law only by engaging in extensive study and research in this distinctively historic field. The law, as is true of the practice of medicine and the ministry, is a learned profession and those seeking advice from another as to their legal rights or for representation in an adversary proceeding must seek out a lawyer. The only person who may lawfully be employed for such purposes under the law of Ohio is a student of the law admitted to the Bar.

It must be self evident with the foregoing recital of the dependency of every member of the community, rich and poor alike, upon lawyers in resolving disputes involving their legal rights and duties where a representative must be employed, that poverty cannot be allowed to deprive an indigent person of necessary legal representation in time of need. The Bar has long stressed the point to its members—the need to provide the services of a lawyer to worthy persons in need of help. Many times, at great financial loss to himself, the individual lawyer in a small community may see to it that a worthy indigent person is properly represented when in need of legal services upon whatever financial basis as is reasonable or possible under the circumstances. In the large urban areas the burden of furnishing such services cannot be successfully accomplished in that way. Providing such services in a proper case is a community duty as a necessary public service, such services being made available and the needs of the indigent more effectively accomplished by a properly organized charitable institution such as a Legal Aid Society.

We come, therefore, to the question of whether or not the Legal Aid Society and its Legal Aid Defender Department in referring indigents to lawyers working on a retainer or under a salary arrangement with the Society is engaging in the unlawful practice of law. At the very outset it must be observed that no benefit can be or is expected by or can possibly result from the legal service rendered to indigent persons to the

Society, nor is any such benefit intended. The procuring of counsel in a proper case is the performance of a needed public service. The Society does not act as an intermediary in procuring the services of a lawyer for a person in need of such service who is unable to pay therefor or to respond to the full extent in payment of the value of the services rendered. The lawyer who renders the service for the indigent person is his lawyer, the relationship is that of attorney and client to whom the lawyer owes the same fidelity as if the client was able to pay the proper fee and the client had engaged the services of the lawyer himself.

The Legal Aid Society, in carrying out its purposes, is only an agency of reference where the lawyers to whom indigent persons in need of legal services may look for compensation under a prearranged agreement. The funds under control of the Society are in no sense to be considered as its assets. The Society is only the channeling agency through which the funds of donors or public departments are given in response to a recognized public need. The Society, in carrying out its part in this necessary endeavor is not attempting to practice law or in its own interest acting as an intermediary for such purpose.

One of the few reported cases dealing with this question is: The Opinion of Justices, 289 Mass., 607, 194 N. E., 313, where the court said:

"The gratuitous furnishing of legal aid to the poor and unfortunate without means in the pursuit of any civil remedy as a matter of charity * * * do not constitute the practice of law."

The many Legal Aid Societies throughout the United States, formed by lawyers or by the action of bar associations or public spirited citizens or charitable organizations, have been rendering such public services for almost one hundred years without serious challenge. So long as their activities stay within the purpose as set out in the Cleveland Society's Charter, quoted above, there is no legal basis upon which their activities can be challenged. The evidence in these cases was such as to support the judgment of the trial court finding the Legal Aid Society in both its activities in the civil and criminal proceedings not to be acting in the unlawful practice of the law. This con-

clusion is supported by Canon 35 of Legal Ethics, which provides:

"The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigents are not deemed such intermediaries."

For the reasons here stated, and in general for the reasons stated by the trial court in the amended opinion found in the papers in the case, the judgment entered by the trial court in each case is affirmed.

KOVACHY, P. J., and HURD, J., concur.